Oaruthers, J.,
deliyered the opinion of the Court.
In this action of ejectment a single question of law arises, and that is, whether the legitimate half-brothers and sisters inherit the land of an illegitimate who dies without children ?
The case is this: Erancis Engate, jr., died in 1847 or ’48, in Hancock county, leaving a widow, who is now dead, hut nc> children, and was the owner of the tract of land in contr®- *21 versy. The -widow sold the land to the defendants, and put them in possession; and that is their title. The plaintiffs claim, as the half-brothers and sisters, or their descendants, of the deceased, under the law of descents, of this State. The •defence to the action is, that Francis Fugare, jr., was base-born, having been the son of the wife of Francis Fugate, sr., begotten and born out of wedlock. It may be taken as settled by the finding of the jury in this case, that this fact is established, and also that the plaintiffs are the children of the same mother, born in wedlock, by the said Francis Fugate, sr., her first husband, and Mahon, her second husband. But we do not inquire into the sufficiency of the proof on those points, nor pass any judgment upon it, as the only material question, now, is that suggested above. Was the Circuit Judge right in holding that legitimate, brothers and sisters could not inherit from an illegitimate ? This depends upon the construction .of the act of 1819, ch. 18, (Car. and Nich., 250,) as that is the act which was in force, and must fix the rights of the parties, at the death of Francis Fugate, jr., in 1847. No reference need be made to the act of 1851, ch. 88, or the provisions of the Code, as they, being subsequent to the death of Fugate, can have no effect upon the rights of these parties.
Before that statute, the common law on that subject was in force in this State. By that law illegitimates could neither •take nor transmit by descent, except to their own offspring, for they had no other heirs, and were destitute of inheritable blood. 4 Kent, 418. The austerity of this rule has been mitigated in most of the States and civilized nations, in favor of the mother and her natural children, so far as related to her property. By the act of 1819, where títere was no lawful issue, illegitimate children were allowed to take the property of the mother, both real and personal, “ by the general rules of descent and distribution.” It then provides — and that is the clause now under consideration — that “ should either of such children die intestate, without child, his or her brothers ■and sisters shall in like manner take his or her estate.” The Circuit Judge, in his construction, confined this change *22 of the common law to illegitimate brothers and sisters, to the exclusion of legitimates. That is, that the statute made the brothers and sisters of a bastard his heirs, if they were also bastards, but continued the common law exclusion of them if they were legitimate. This is a discrimination against the general policy of the law, by which lawful children or kindred are preferred to those that are base-born. It is difficult to. suppose that such was the intention of the Legislature. On what reason could it be founded, if such was the intention, it is not easy to conceive. It should require language too plain for construction to authorize or justify the conclusion that the Legislature intended to communicate inheritable blood to a bastard in favor of brothers born out of wedlock like himself,, and not to those equally near to him in blood who happened to be more fortunate by being lawfully begotten. We would not presume without the use of phraseology entirely unequivocal that such an absurdity was intended.
The provision is, that when,a bastard having property dies intestate and without children, “his brothers and sisters shall take his estate.” What authority have we to limit this to any particular description of brothers, or to inquire whether they are the illegitimate or lawful offspring of the same mother t If this could be done at all, it would seem most proper in favor of good morals and public policy to- discriminate the other way. But we must take the terms used to have their ordinary meaning, and embrace all brothers and sisters, without regard to their legitimacy.
For this error then, in the charge of his Honor, on a question lying at the foundation of the case, we must reverse the judgment, and order a new trial.